UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL J. KAST                          CIVIL ACTION

VERSUS                                   NO: 09-4575

THE GREATER NEW ORLEANS EXPRESSWAY       SECTION: R(4)
COMMISSION, ROBERT J. LAMBERT AND
FRANK LEVY

## ORDER AND REASONS

Before the Court is the motion to dismiss of defendants the
Greater New Orleans Expressway Commission ("GNOEC"), Robert
Lambert, and Frank Levy.[1]  For the following reasons, the Court
GRANTS defendants' motion.

## I.    BACKGROUND

This action concerns the firing of Plaintiff Michael J. Kast
for his purported role in handling the high profile traffic stop
of Mandeville, Louisiana Mayor Eddie Price.  At the time of the
incident, Kast was employed by GNOEC as a Lieutenant and
Operations Supervisor for the Causeway Police Department ("CPD"),
the enforcement division of the GNOEC.[2]

---

[1]    (R. Doc. 41.)

[2]    (R. Doc. 44, Ex. A, Kast Aff.)

**A.    FACTUAL HISTORY**

**1.    The Causeway Incident**

On April 22, 2008, shortly before midnight, Price approached a tollbooth on the north shore side of the Lake Pontchartrain Causeway.[3]  The tollbooth lane was closed.  The gate was down.  Flashing lights indicated the tollbooth's closure.[4]  Price bumped the gate twice with his car, revved his engine, and barreled through the wooden arm of the tollbooth, damaging it in the process.[5]  After breaking through the wooden tollbooth arm, Price stopped his car.[6]  The tollbooth operator instructed Price to stay where he was because she had called the police.[7]  Rather than remaining still, however, Price started his car and drove down the Causeway towards New Orleans with his lights off.[8]  The tollbooth operator took down Price's license plate number and called the CPD officers on duty.[9]

---

[3]    (R. Doc. 41, Ex. B, Statement of Tollbooth Operator.)

[4]    *Id.*

[5]    *Id.*

[6]    *Id.*

[7]    *Id.*

[8]    *Id.;* (R. Doc. 31, ¶ 18.)

[9]    (R. Doc. 41, Ex. B, Statement of Tollbooth Operator.)

CPD officers Dupont and Dorsett responded to the tollbooth operator's call and pulled Price over shortly after midnight.[10] Dupont and Dorsett allegedly recognized Price, and Price admitted to the two officers that he had been drinking.[11] Nevertheless, Dupont and Dorsett did not administer a standard field sobriety test to determine Price's level of intoxication.[12] Instead, Dupont phoned Kast, his immediate supervisor, who was off-duty at the time.[13] Dupont informed Kast that he had made a traffic stop, the suspect was Mayor Price, and Price had been drinking, though he did not appear "impaired."[14] Dupont asked Kast what to do, and Kast responded that it was Dupont's decision because Dupont was the officer who had made the traffic stop and personally observed Price's mannerisms.[15] Kast also instructed Dupont to call Chief Lociano and inform him of the situation.[16] Dupont then called Chief Lociano.[17] Chief Lociano gave Dupont the same instructions given by Kast, *i.e.*, to determine for

---

[10]   (R. Doc. 31, ¶ 18-19)

[11]   (R. Doc. 30.)

[12]   *Id.*

[13]   (R. Doc. 30.)

[14]   *Id.*

[15]   (R. Doc. 31, ¶ 21.)

[16]   *Id.*

[17]   (R. Doc. 30.)

himself what action to take with Price.[18]  Ultimately, Dupont and

Dorsett chose to let Price go without a citation or warning, and

without having administered a field sobriety test.[19]

## 2.  CPD Internal Investigation

On May 5, 2008, Conrad H. Franz, a CPD officer, initiated an

internal investigation into the April 22 traffic stop of Mayor

Price.[20]  Franz's investigation involved the collection of

evidence and taking of witness statements.[21]  Pertinent here,

Franz took two separate statements from Kast.[22]  In the first

statement, Kast allegedly told Franz that he would follow the law

and not participate in any CPD "cover-up" of the Price traffic

stop.[23]  Kast does not allege, however, that Franz or any other

CPD officer asked him to participate in a cover-up.[24]  In the

---

[18]    (R. Doc. 31, ¶ 22.)

[19]    Dorsett's police incident report indicates that Price
was in violation of La. R.S. 32:58, the criminal statute
prohibiting the careless operation of a motor vehicle.  (R. Doc.
21, Ex. A, GNOEC Report.)

[20]    (R. Doc. 41, Ex. A(1), Final Report of GNOEC
Investigation.)

[21]    (R. Doc. 31, ¶ 29.)

[22]    (R. Doc. 41, Ex. A(1), Final Report of GNOEC
Investigation.)

[23]    (R. Doc. 1, ¶ 17.)

[24]    (R. Doc. 31.)  At oral argument the Court questioned
Kast's attorney as to why no allegation that Kast was asked to
take part in a coverup appeared in Kast's complaint.  Kast's
attorney first argued that it was implicit in Kast's complaint.

second statement, Kast clarified that Dupont had notified him of the Price traffic stop, which was consistent with the requirements of a standing order issued by Chief Lociano.[25] According to Kast, the standing order required an officer who arrested a politician or "otherwise connected" individual to notify Kast and Chief Lociano of the incident because of the potential publicity associated with the arrest.[26]

At the conclusion of the CPD internal investigation, Franz prepared a 14-page report.[27] The report concluded that Dupont and Dorsett should have given Price a field sobriety test before releasing him to determine if Price was driving while impaired.[28] As a result of the report's recommendations, the CPD issued a citation to Mayor Price on June 24, 2008 for careless operation of a motor vehicle.[29] The CPD also took disciplinary action against both Dorsett and Dupont.[30]

---

He then conceded that the complaint could have been stated more clearly but believed that Kast could say that he had been asked to participate in a cover up.

[25]

[26]    (R. Doc. 1, ¶ 8.)

[27]    (R. Doc. 31, ¶ 29.)

[28]    (R. Doc. 31, ¶ 30.)

[29]    (R. Doc. 31, ¶ 29.)

[30]    (R. Doc. 41. Ex. A(1), Final Report of GNOEC Investigation.)

### 3. GNOEC Investigation

Defendant GNOEC also conducted its own independent investigation into the Mayor Price incident.[31] The purpose of this second investigation was both to determine whether Dupont and Dorsett handled the situation appropriately and to respond to "anonymous allegations of a police cover-up."[32] The GNOEC appointed a four member panel to perform the investigation.[33] The panel consisted of two outside attorneys, a retired Drug Enforcement Administration agent, and defendant Frank Levy, the Vice Chairman of the GNOEC.[34] During the course of its investigation, the panel reviewed the CPD internal investigation reports, interviewed GNOEC personnel, and reviewed state and local law relevant to the Price traffic stop.[35] One panel member, William Reinhardt, contacted Kast and conducted a short telephone interview with him. During the interview, Kast "reiterated that he intended to follow Louisiana law and CPD policies and procedures, and would not participate in 'cover-ups' or granting

---

[31]    *Id.*

[32]    *Id.*

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

certain citizens–including Mayor Price–preferential treatment based on who they were or who they knew."[36]

On July 1, 2008, the GNOEC independent panel issued a 28-page report detailing its findings of facts and conclusions.[37] The report found that Kast abdicated his responsibilities under CPD Regulation 17-3 by instructing Dupont to call Chief Lociano instead of either giving Dupont a direct order instructing him how to handle the situation or personally responding to the scene once Dupont called him.[38]  The Report concluded that Kast should be terminated because his actions were "clearly contrary to departmental policy, rules and regulations."[39]  On July 1, 2008, defendant Robert Lambert, the General Manager of the GNOEC, asked Kast to resign from the CPD.[40]  After Kast refused, Lambert fired him.[41]

**B.    PROCEDURAL HISTORY**

Kast sued defendants on July 2, 2009, alleging that defendants retaliated against him in violation of his right to

---

[36]    (R. Doc. 31, ¶ 53.)

[37]    (R. Doc. 41. Ex. A(1), Final Report of GNOEC Investigation.)

[38]    *Id.*

[39]    *Id.*

[40]    (R. Doc. 1, ¶¶ 32-33.)

[41]    (R. Doc. 1, ¶ 33-38.)  *See also* La. R.S. § 23:967 (Louisiana Whistleblower Statute).

free speech under the First Amendment and in violation of the Louisiana Whistleblower statute.[42] Specifically, Kast contends that he was fired because he complained to Reinhardt about the panel's interpretation of CPD Regulation 17-3 and what actions it required Kast to take during Price's traffic stop.[43] Defendants removed the case to this Court under 28 U.S.C. § 1441 on the basis of Kast's federal claims.[44]

On September 9, 2009, defendants filed a motion to dismiss Kast's suit under Rule 12(b)(6), or alternatively a motion for summary judgment under Rule 56.[45] Instead of responding to the defendants' motion, Kast asked the Court for leave to amend his complaint.[46] The Court granted Kast's request on January 14, 2010.[47] Kast's amended complaint adds factual allegations about the preferential treatment defendants gave to politically connected individuals during and after traffic stops and arrests.[48] Kast's amended complaint also alleges that he was fired, in part, for continually voicing his opposition to

---

[42]   (R. Doc. 1.)

[43]   *Id.*

[44]   (R. Doc. 1.)

[45]   (R. Doc. 9.)

[46]   (R. Doc. 19.)

[47]   (R. Doc. 30.)

[48]   (R. Doc. 31, ¶¶ 14-15.)

Lambert's preferential treatment of politically connected individuals to Lociano, Lambert, and "others."[49]

## II.  LEGAL STANDARD

## A.  Determination

Defendants now re-urge their motion, with attached exhibits, styled "Motion to Dismiss Case for Failure to State a Claim upon which Relief Can Be Granted, and Rule 56 Motion for Summary Judgment."[50]  Defendants acknowledge that the Court may convert the Motion into a Rule 56 motion for summary judgment if it examines matters outside the pleadings.[51]  The Court must determine whether it will entertain the motion under the standard appropriate to motions to dismiss, or that appropriate to motions for summary judgment.

Defendants have attached exhibits to their motion, and Kast attached affidavits to his opposition.[52]  Some of this material is duplicative of the pleadings that the Court may legitimately

---

[49]    (R. Doc. 30.)

[50]    (R. Doc. 41.)

[51]    *See* Fed. R. Civ. P. 12(d).

[52]    Specifically, Kast attaches three affidavits: his own, that of his father-in-law, John Zifle, and that of his former co-worker, Albert Resendez. (R. Doc. 44.)

consider when adjudicating a motion to dismiss.[53]  Other

material, such as third-party affidavits and CPD regulations that

were not attached to Kast's complaint or amended complaint,

cannot be considered by the Court without transforming the motion

into a motion for summary judgment.  Federal Rule of Civil

Procedure 12(d) indicates that "[a]ll parties must be given a

reasonable opportunity to present all the material that is

pertinent to the motion" before the Court may transform a motion

to dismiss into a motion for summary judgment.[54]  Although Kast

recites the motion-to-dismiss standard in his opposition to

defendants' motion, he also recites the summary judgment standard

and presents material outside the pleadings.  Furthermore, Kast

has made no argument that the Court should decline to consider

---

[53]  *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006); *see also Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995).  Kast's affidavit restates the allegations in his amended complaint.  (R. Doc. 44, Kast Aff.)

[54]  Fed. R. Civ. P. 12(d).  *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d Ed. 2004) ("As the language of the rule suggests, federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.")  An exception, inapplicable here, is when the material attached to the motion to dismiss is referred to in the plaintiff's complaint and is central to his claim.  *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

materials outside the pleadings[55], or that it should not construe the motion as one for summary judgment.

Kast twice states that defendants seek to dismiss "before any discovery has been taken." (R. Doc. 44.) This argument implicates Rule 56(f), which states that if:

> a party opposing the motion shows by afficavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.[56]

---

[55] Kast objects to the consideration of defendants' exhibits on the basis that the exhibits are not properly authenticated. Defendants attach to their motion CPD Regulations, the GNOEC investigation report, the statement of Marlene Williams taken during the CPD investigation, and the Price traffic stop crash report. In addition, defendants include a certification by the GNOEC custodian of records that based on her "knowledge" the exhibits are "true, and accurate" and "kept in the ordinary course of business." This is sufficient to satisfy the requirements set forth in Federal Rule of Evidence 803(6), 104(a), and 902(11) with regard to the admissability and certification of business records. *See* Fed. R. Evid. 803(6); *United States v. Bryant*, 04-CR-00047 2006 WL 1700107 (W.D.Va. 2006). Even if insufficient, the Fifth Circuit has stated that business records can be admitted "where circumstances indicate that the records are trustworthy." *See United States v. Veytia-Bravo*, 603 F.2d 1187, 1191-92 (5th Cir. 1979)(records prepared in ordinary course of business, and not for litigation, trustworthy); *See also United States v. Flom*, 558 F.2d 1179, 1182-83 (5th Cir. 1979)(trustworthiness of business records sufficient authentication). Here, a custodian certified the records and indicated that they were prepared in the ordinary course of business. Kast has provided no evidence that might indicate that the records are not true and accurate, and in fact he does not even suggest this. Without reason to doubt the trustworthiness of the records, the Court finds that defendants' exhibits are properly authenticated.

[56] Fed. R. Civ. P. 56(f).

Here, Kast responded to defendants' motion with his own summary judgment type evidence. He has not indicated what other "essential facts" he seeks to obtain through further discovery. Moreover, Kast does not argue that he could not, without discovery, "present by affidavit facts essential to justify the party's opposition." Nor does Kast suggest that he will be prejudiced in any manner by the Court's consideration of defendants' motion as one for summary judgment.[57] The Court will therefore treat the motion as one for summary judgment.

**B.    Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[58] When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[59] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits

---

[57]    *See, e.g., In re Repetitive Stress Injury Litigation*, 165 F.R.D. 367, 376 (E.D.N.Y. 1996);

[58]    Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[59]    *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

12

setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[60]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[61]  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[62]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[63]  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue

---

[60]    *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[61]    *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).

[62]    *Id.* at 1265.

[63]    *Celotex*, 477 U.S. at 325.

exists.[64] The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.[65]

## III. DISCUSSION

Defendants argue that Kast's First Amendment claim must fail because Kast's speech is not protected by the First Amendment.[66] As to Kast's state law claim, defendants argue that Kast has not engaged in activity protected by the Louisiana Whistleblower Statute.[67]

### A. FIRST AMENDMENT RETALIATION CLAIM

To establish a First Amendment retaliatory discharge claim, Kast must prove that:

> (1) he suffered "an adverse employment action," (2) he spoke "as a citizen on a matter of public concern," (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the speech 'precipitated the adverse employment action."[68]

---

[64]    *Id.* at 324.

[65]    *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

[66]    (R. Doc. 41.); *See also Garcetti v. Ceballos*, 547 U.S. 410 (2006).

[67]    (R. Doc. 41.)

[68]    *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007)(internal citations omitted).

Here, Kast has failed to create a genuine issue of fact that he spoke as a citizen on a matter of public concern, and not as a public employee pursuant to his official duties.  The Court therefore need not consider the other elements of Kast's First Amendment retaliation claim.[69]

## 1. *Garcetti* and the Citizen/Employee Dichotomy

In *Garcetti v. Ceballos*, the Supreme Court held that the First Amendment does not protect speech made pursuant to an employee's official duties.[70]  Ceballos worked as a deputy district attorney in the Los Angeles County District Attorney's Office.[71]  When he discovered what he believed to be inaccuracies in an affidavit supporting a search warrant, he wrote a memo to his supervisor suggesting that the DA's office not prosecute the crime.[72]  The supervisor responded by transferring Ceballos and refusing to promote him.[73]  Ceballos sued, arguing that his memo was protected speech under the First Amendment.[74]  Reversing the

---

[69]   *See Garcetti*, 547 U.S. at 421.

[70]   *Id.*

[71]   *Id.* at 413.

[72]   *Id.* at 414.

[73]   *Id.* at 415.

[74]   *Id.*

Ninth Circuit[75] and ultimately rejecting Ceballos's claim, the Supreme Court stated that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[76]

Since *Garcetti*, the Fifth Circuit has further expounded upon when a public employee speaks pursuant to his "official duties."[77]  In *Williams v. Dallas Independent School District*, a high school principal fired Williams, then an athletic director and head football coach, for writing a memorandum concerning the alleged improper allocation of revenue from gate receipts generated by athletic events held on campus.[78]  Williams argued that he wrote the memorandum as a "taxpayer" and a "father," and the school district conceded that the memorandum was not required by Williams's job.[79]  The Fifth Circuit found, however, that

_____

[75]    *Ceballos v. Garcetti*, 361 F.3d 1168, 1174-75 (9th Cir. 2004)(holding that the First Amendment applies to speech that is part of a worker's responsibilities).

[76]    *Garcetti*, 547 U.S. at 421.

[77]    *See e.g., Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 693-94 (5th Cir. 2007)(per curiam); *see also Nixon*, 511 F.3d at 497; *Charles v. Grief*, 522 F.3d 508, 513-14 (5th Cir. 2008); *Davis v. McKinney*, 518 F.3d 305, 311-314 (5th Cir. 2008).

[78]    *Williams,* 480 F.3d at 690-91.

[79]    *Id.* at 691-92.

Williams's job required him to consult with the principal about the athletic department budget, and Williams had "special knowledge" of the allocation of gate receipts as a result of his position as athletic director.[80] The Court therefore held that Williams's speech was in the "course of performing his job" and not protected by the First Amendment.[81]

As an initial matter, Kast does not identify the precise content of his statements or instances of speech that allegedly led to his dismissal.[82] Instead, he provides abstract descriptions of communications that he had with certain individuals.[83] He relies on three communications for his retaliation claim, which the Court will examine below.

First, Kast argues that he refused to participate in a cover-up of the Price traffic stop.[84] Second, Kast contends that he complained about the GNOEC panel's interpretation of CPD Regulation 17-3.[85] And lastly, Kast suggests that in the past,

---

[80]    *Id.* at 693-94.

[81]    *Id.*

[82]    (R. Doc. 31 and 44.)

[83]    (R. Doc. 31, ¶ 87.)

[84]    (R. Doc. 31 and 44.)

[85]    *Id.*

he complained to Lambert and third-parties about GNOEC's

preferential treatment of well-connected individuals.[86]

### a. Kast's Refusal to Participate in a Cover-Up

Kast contends that during the GNOEC investigation he told

Reinhardt that "he intended to follow Louisiana law and CPD

policies and procedures, and would not participate in 'cover-

ups.'"[87] Kast also asserts that he made the same statement to

Franz and Lociano during the CPD internal investigation.[88]  Kast

does not state, however, that any CPD officer or GNOEC employee

asked him to participate in any cover-up, or that he reported to

anyone that a cover-up existed.[89]

The Court finds that Kast's unsolicited statements during

the GNOEC and CPD investigations were made in the course of his

"official duties" as a police officer.  Kast's statement to

Reinhardt was made at work during "the [GNOEC] panel's only

_____

[86]     *Id.*

[87]     (R. Doc. 31, ¶ 28.)

[88]     (R. Doc. 44, Ex. A, Kast Aff ¶ 51.)

[89]     At oral argument, Kast's attorney stated that the
request for Kast to participate in a cover-up was implicit in
Kast's amended complaint.  It was not.  If such a request did in
fact occur, Kast could have added the factual allegation to his
complaint when he first moved to amend.  *See Joseph v. Cannon*,
1996 WL 41849, at *1 (E.D.La. Feb. 1, 1996)(allowing amendment of
complaint to add factual allegations)(citing *Engstrom v. First
Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1464 (5th Cir. 1995)).

contact" with Kast.[90]   Kast's statement also concerned the

alleged cover-up of the Price traffic stop.[91]   The CPD's response

to the Price traffic stop, whether a cover-up or otherwise, was

within Kast's work duties.

It is not dispositive, however, that Kast's statement during

the GNOEC investigation was made within the workplace and

concerned a matter related to his employment.[92]   The *Garcetti*

inquiry is a "practical one" designed to uncover "the duties an

employee actually is expected to perform."[93]   To this end, Kast

admits that he was in charge of the day-to-day operations of the

CPD.[94]   Moreover, Kast points out that a standing order existed

requiring CPD officers patrolling the Causeway to notify Kast of

any incident involving a high-profile individual so that he could

"respond intelligently to any inquiries about the incident from

the public, the press or the GNOEC."[95]   As instructed by the

standing order, Dupont called Kast to inform Kast that he and

---

[90]   (R. Doc. 31, ¶ 53.)

[91]   *Id.*

[92]   *Garcetti*, 547 U.S. at 424-25; *see also Davis*, 518 F.3d
at 313 n. 3 (citing *Williams*, 480 F.3d at 694 n. 1 (recognizing
"that it is not dispositive that a public employee's statements
are made internally.")).

[93]   *Garcetti*, 547 U.S. at 424-25.

[94]   (R. Doc. 31, ¶ 11.)

[95]   (R. Doc. 31, ¶ 11.)

Dorsett had pulled-over Price.[96]  The standing order contemplated that Kast would have to respond to an "inquiry" by the GNOEC.  It should have come as no surprise that the GNOEC later chose to investigate the Price incident and that Kast's response would be part of his work-related duties under the standing order.[97]  In addition, police officers have an obligation to participate in internal investigations as a matter of public policy.[98]

Similarly, Kast's statement that he would not participate in a cover-up, made during the CPD internal investigation, was also part of his official duties.  Unlike the GNOEC investigation, the CPD internal investigation was authorized and, in part, conducted by Kast's direct supervisor, Lociano.[99]  Lociano, along with Franz, interviewed Kast because of Kast's involvement with the Price traffic stop, namely his phone conversation with Dupont.[100]

---

[96]    (R. Doc. 31, ¶ 20.)

[97]    (R. Doc. 31, ¶ 11.)

[98]    *See City of Baton Rough/Parish of East Baton Rough v. Capital City Press, L.L.C.*, 4 So.3d 807, 815 (La. Ct. App. 2009)(finding that police participation in internal investigations is critical, as a matter of public policy); *see also Bradley v. James*, 479 F.3d 536, 538 (8th Cir. 2007)(police have an official duty to cooperate in an internal investigation); *Toledo Police Patrolman's Ass'n v. City of Toledo*, 904 F.2d 36 (6th Cir. 1990)(unpublished)(relying, in part, on Toledo Municipal Code).

[99]    (R. Doc. 41, Ex. A(1), Final Report of GNOEC Investigation).

[100]    (R. Do. 31, ¶ 28.)

Kast's statement was thus made at work, to his supervisor, and in the setting of an employer investigating the conduct of its employee.[101] "The case law is unanimous in holding that employee's communications that relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment Protection."[102]

### b. Kast's Statements Concerning CPD Regulation 17-3

Kast next argues that he was fired because he complained to Lambert and Reinhardt about the GNOEC's interpretation of CPD Regulation 17-3.[103] CPD Regulation 17-3 states that "a supervisor should respond to the scene of any incident or situation . . . where media attention is anticipated (*e.g.*, major incident, prolonged closure of roadways)."[104] The GNOEC panel concluded that under CPD Regulation 17-3, Kast, as a supervisor, should have responded to the scene of the Price traffic stop because media attention was anticipated.[105] Kast, on the other hand,

---

[101]   *Id.*

[102]   *Davis*, 518 F.3d at 313 n. 3 (citing *Williams*, 480 F.3d at 694 n. 1 (recognizing "that it is not dispositive that a public employee's statements are made internally.")).

[103]   (R. Doc. 31, ¶ 87.)

[104]   (R. Doc. 41, Ex. A(2), CPD Regulation 17-3.)

[105]   (R. Doc. 41, Ex. A(1), Final Report of GNOEC Investigation.)

contends that CPD Regulation 17-3 does not apply because the Price traffic stop did not involve contemporaneous media attention due to a "prolonged closure of roadways" or because of the presence of any of the other listed examples.[106]

Kast's grievance with the GNOEC panel is no different than Ceballos's memorandum in *Garcetti*. It is speech made at work, up the chain of command, taking issue with the manner in which a particular policy is implemented.

Kast attempts to distinguish *Garcetti* by stating that the fact that he complained to a superior is not a bar to his claim.[107] In support, Kast cites *Givhan v. Western Line Consolidated School District*[108], a pre-*Garcetti* case in which the Supreme Court stated that its precedent does not "support the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly."[109] The speech at issue in *Givhan*, however, did not relate to a personal employment dispute. Rather, Givhan arranged to meet with her employer privately to discuss the discriminatory nature of the

---

[106]  (R. Doc. 31, ¶ 55.)

[107]  (R. Doc. 44.)

[108]  439 U.S. 410 (1979).

[109]  *Id.* at 414.

22

employer's policies, which did not pose a direct threat to her job.[110]

In contrast, Kast's complaints were made in the context of an investigation of his conduct and concerned his personal employment situation. Because of this, Kast's speech is more analogous to that in the Fifth Circuit pre-*Garcetti* case, *Teague v. City of Flower Mound, Texas.*[111] In *Teague*, the Fifth Circuit held that police officers' statements concerning police misconduct were made in the officers' capacity as employees embroiled in an employment dispute, and therefore were not entitled to First Amendment protection.[112] As is the case here, the Fifth Circuit noted that the police officers' "focus (following their reprimands) was primarily on clearing their names-not on rooting out police corruption *per se.*"[113] Here, Kast complained only after the GNOEC panel concluded that he violated CPD Regulation 17-3 and recommended that he be terminated as a result.[114] His speech is thus distinguishable from the protected speech in *Givhan* and more similar to the unprotected speech in *Garcetti* and *Teague*.

---

[110] *Id.* at 412.

[111] 179 F.3d 377 (5th Cir. 1999).

[112] *Id.* at 383.

[113] *Id.*

[114] (R. Doc. 44 and 31.)

23

### c. Kast's Past Complaints About Preferential Treatment

Finally, Kast argues that he was fired for complaining about the preferential treatment Lambert provided well-connected individuals.[115]  In particular, Kast alleges that he objected to: (1) Lambert's allowing a politician to use a GNOEC generator to power his residence after Hurricane Katrina, (2) Lambert's forcing GNOEC employees to campaign for particular political candidates,(3) Lambert's forcing GNOEC employees to perform auto repairs for favored individuals, (4) Lambert's donating GNOEC money to the City of Mandeville, and (5) Lambert's using a CPD Sport Utility Vehicle to travel with other GNOEC personnel after Hurricane Katrina.[116]

Kast contends that he complained about Lambert's conduct to Lociano, Lambert, and "members of the public, including friends and relatives."[117]  In support, Kast attaches the affidavits of John Zifle, his father-in-law, and Albert Resendez, Kast's former co-worker.[118]  Zifle's affidavit states that he and Kast discussed Lambert's activities at family social gatherings.[119]  Resendez's

---

[115]    (R. Doc. 44.)

[116]    (R. Doc. 31, ¶¶ 61–83.)

[117]    (R. Doc. 31, ¶¶ 42, 72.)

[118]    (R. Doc. 44.)

[119]    (R. Doc. 44, Ex. B, Zifle Aff.)

affidavit states that Kast discussed with him Lambert's handling of the GNOEC generator incident.[120]

### i.    *Complaints to Lociano and Lambert*

Kast's complaints to Lociano and Lambert were made pursuant to his official duties and are not protected by the First Amendment.  First, Lociano and Lambert are Kast's superior officers.[121]  Communications Kast made to each were therefore made internally, and up the chain of command.  Second, reporting Lambert's alleged misconduct was part of Kast's official duties under the GNOEC employee handbook.[122]  Specifically, CPD Regulation 3-1.1 requires a supervisor such as Kast to report to his superior matters concerning "gross misconduct by a [GNOEC] member, suspected or confirmed corruption, [or] suspected or confirmed illegal activities by a [GNOEC] member."[123]  Kast acknowledged that he received a copy of the GNOEC handbook, and that it was his responsibility to read and comply with the policies contained in it.[124]  In sum, CPD policies required Kast to report Lambert's alleged misconduct and Kast did so to his

---

[120]    (R. Doc. 44, Ex. C, Resendez Aff.)

[121]    (R. Doc. 31.)

[122]    (R. Doc. 41, Ex. A(8), CPD Regulation 3-1.1.)

[123]    *Id.*

[124]    (R. Doc. 41, Ex. A(9), Acknowledgment and Manual Receipts.)

superior officers.  Such speech is within the confines of Kast's official duties.

### ii.  *Complaints to Zifle and Resendez*

When Kast complained to Zifle and Resendez his speech was that of a private citizen.  Zifle and Resendez were not Kast's superiors.[125]  Zifle was a member of Kast's family unaffiliated with the GNOEC, and Resendez was a shop employee at GNOEC.[126]  When "a public employee takes his job concerns to persons outside the work-place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."[127]  Defendants contend that Kast's complaints to Zifle and Resendez would still fall under his duty to report under CPD Regulation 3-1.1.[128]  But on its face CPD Regulation 3-1.1 does not apply to Kast's discussions with non-superior officers or individuals unaffiliated with the GNOEC.[129]  The Court thus finds that Kast's complaints to Zifle and Resendez were not pursuant to his official duties.

---

[125]   (R. Doc. 44, Ex. B and C.)

[126]   *Id.*

[127]   *See Davis v.* McKinney, 518 F.3d 304, 313 (5th Cir. 2008)(citing *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006)).

[128]   (R. Doc. 41.)

[129]   (R. Doc. 41, Ex. A(8), CPD Regulation 3-1.1.)

Although Kast complained to Zifle and Resendez as a private citizen, he must still establish that his speech addressed a matter of public concern for it to garner First Amendment protection.[130]  To determine whether speech is on a matter of public concern, the Court examines the "content, form, and context of a given statement, as revealed by the whole record."[131]

It is true that the content of Kast's speech to Zifle and Resendez reveals instances of alleged police misconduct, and therefore implicates a matter of public concern.[132]  On the other hand, the form and context of Kast's speech weigh against such a conclusion and suggest private speech: Kast, simply did not make the public aware of his concerns.  A main purpose of First Amendment protection is to promote the "public's interest in receiving the well-informed views of government employees engaging in civic discussion."[133]  For example, the Fifth Circuit

---

[130]    *See Davis v.* McKinney, 518 F.3d 304, 313 (5th Cir. 2008); Huth *v. Haslun*, 598 F.3d 70, 74 (2d. Cir. 2010); *Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010); *Desrochers v. City of San Bernardino*, 572 F.3d 703, 714 (9th Cir. 2009).

[131]    *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Jordan v. Ector County*, 516 F.3d 290, 295 (5th Cir. 2008).

[132]    *See Forsyth v. City of Dallas*, 91 F.3d 769, 773-74 (5th Cir. 1996)(concerning illegal wiretaps); Brawner v. City of Richardson, 855 F.2d 187, 192 (5th Cir. 1988)(allegations of police misconduct); *Branton v. City of Dallas*, 272 F.3d 730, 745 (5th Cir. 2001)("We have held that public employees' speech reporting official misconduct, wrongdoing, or malfeasance on the part of public employees involves matters of public concern.").

[133]    *Garcetti*, 547 U.S. at 419.

has held that speech made outside the work-setting to reporters or elected officials is of public concern.[134]  On the other hand, the Fifth Circuit has indicated that speech that is not disclosed to the public, such as that made in a personal notebook or to members of the same institution, is not.[135]  The Court finds that Kast's speech at private family gatherings and to his co-worker are more analogous to the latter.  Kast did not attempt to bring to light the alleged wrongdoing at the GNOEC by notifying a reporter or public official.[136]  The Court therefore finds that Kast's complaints to Zifle and Resendez do not qualify for First Amendment protection.

---

[134]  *Markos v. City of Atlanta Tex,* 364 F.3d 567, 572-74 (5th Cir. 2004)(statements to newspaper); *Davis v. Ector County*, 40 F.3d 777, 786 (5th Cir. 1994)(letter to Commissioner's Court); *Modica v. Taylor*, 465 F.3d 174, 180-182 (5th Cir. 2006)(letter to state representative).

[135]  *See, e.g., Terrell v. University of Texas System Police*, 792 F.2d 1360, 1362-63 (5th Cir. 1986)(personal notebook); Markos, 364 F.3d at 572 (discussing *Bradshaw v. Pittsburg Independent School Dist.*, 207 F.3d 814 (5 Cir. 2000)(speech within institution)).  *See also Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985) (*Connick* "requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?").

[136]  *Markos,* 364 F.3d at 572-74 (statements to newspaper); *Davis*, 40 F.3d at 786 (letter to Commissioner's Court); *Modica*, 465 F.3d at 180-182 (letter to state representative).

## 2.   Substantial or Motivating Factor Behind Defendants Action

Even assuming, *arguendo*, that Kast's speech to Zifle and Resendez is protected by the First Amendment, Kast has not shown that his protected speech was a substantial or motivating factor behind the GNOEC's decision to fire him.  Defendants provide evidence that it was Kast's mishandling of the Price traffic stop, violation of CPD Regulation 17-3, and the conclusions of the GNOEC panel investigation that precipitated Kast's termination.[137]  This is sufficient to carry defendants' initial burden on summary judgment.[138]  The burden thus shifts to Kast, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists that a substantial or motivating factor behind his termination was his protected speech.[139]

Kast provides no argument and does not refer to particular evidence in the record in support of his position.[140]  Instead, Kast suggests that his affidavit and amended complaint are enough on their own.[141]  Kast's affidavit restates the allegations and

---

[137]   (R. Doc. 41.)

[138]   *Celotex*, 477 U.S. at 325.

[139]   *Id.* at 324.

[140]   (R. Doc. 44.)

[141]   *Id.*

arguments in his amended complaint almost verbatim.[142]  Kast's
affidavit does not provide a sufficient evidentiary basis to
defeat summary judgment.[143]

Kast's best effort to defeat summary judgment would rely on
two facts: that Lambert fired Kast and that Lambert did so
because he was aware of Kast's complaints to Zifle and Resendez
and disagreed with Kast's stated positions therein.  Evidence of
Lambert's knowledge of Kast's communications to Zifle and
Resendez is noticeably absent from the record.  Kast's affidavit
makes no mention as to whether Lociano, Lambert, or any GNOEC
employee knew of Kast's communications.[144]  Nor do the affidavits
of Zifle and Resendez support this inference.[145]  When a plaintiff
brings a constitutional action against a public official, he
"must identify affirmative evidence from which a jury could find
that the plaintiff has carried his or her burden of proving the
pertinent motive."[146]  Without any evidence suggesting that

---

[142]   (R. Doc. 44, Ex. A, Kast Aff.)

[143]   *See, e.g., Celotex*, 477 U.S. at 325; *Little*, 37 F.3d at
1075; *Isquith for and on Behalf of Isquith v. Middle South
Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*,
488 U.S. 926 (1988).

[144]   (R. Doc. 41, Ex. A, Kast Aff.)

[145]   (R. Doc. 41, Ex. B and C.)

[146]   *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

Lambert knew of Kast's protected speech, Kast has failed to set forth any "affirmative evidence" of Lambert's wrongful motive.

Lastly, it is persuasive that the Fifth Circuit has found even more favorable facts insufficient to preclude summary judgment.[147] In *Gerhart v. Hayes,* the only evidence of retaliation was the termination decision itself, and the fact that the employer was aware of and disagreed with the employee's stated position.[148] The Fifth Circuit held that Gerhart did not put forward any evidence of Hayes's improper intent, and thus his claim could not survive summary judgment.[149] Here, not only does Kast fail to put forward any evidence of Lambert's improper intent, but also Kast fails to put forward any evidence that Lambert knew of his protected speech and disagreed with it. Further, the statements to the shop employee were made almost five years ago, and although Zifle provides no date for Kast's communications with him, most of the content concerned events shortly after Hurricane Katrina, which was almost 5 years ago. The elapse of such a long period between speech and allegations

---

[147] *See Gerhart v. Hayes*, 217 F.3d 320 (5th Cir. 2000).

[148] *Id.*

[149] *Id.*

of retaliation also undermine Kast's claim.[150]  Defendants' motion

for summary judgment is therefore GRANTED.

## B.    LOUISIANA WHISTLEBLOWER STATUTE

Kast next alleges that he was terminated in violation of the

Louisiana Whistleblower Protection Act.[151]  The parties dispute

the requirements and application of the Act.[152]  The Court,

however, has disposed of the only claim arising under federal

law, and the Court does not have original jurisdiction over the

Louisiana Whistleblower Protection Act claim, which arises under

State law.  Accordingly, the Court must consider whether to

continue to exercise supplemental jurisdiction over Kast's

remaining claim.[153]  A district court may decline to exercise

supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State
> law,

> (2) the claim substantially predominates over the claim
> or claims over which the district court has original
> jurisdiction,

> (3) the district court has dismissed all claims over
> which it has original jurisdiction, or

---

[150]    *See Brady v. Houston Independent School Dist.*, 113 F.3d
1419, 1424 (5th Cir. 1997)(eighteen-month lapse); *Grizzle v.
Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir.
1994)(ten-month lapse).

[151]    La. Rev. Stat. § 23:967.

[152]    (R. Doc. 44 and 41.)

[153]    See 28 U.S.C. § 1367.

(4) in exceptional circumstances, there are other
compelling reasons for declining jurisdiction.[154]

In addition to the statutory factors, the court must also balance the factors of judicial economy, convenience, fairness, and comity.[155] The Court has "wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed."[156] Still, the "general rule" is to decline to exercise jurisdiction over pendent state-law claims when all federal claims have been eliminated prior to trial.[157]

Here, the Court has dismissed the claims over which it had original jurisdiction. Only a state-law claim remains, and the Court has no independent basis for jurisdiction over it. The Court has not yet addressed the merits of this claim, and doing so will require it to delve into sophisticated issues of state law. The Louisiana Whistleblower Protection Act fundamentally implicates the level of protection that the State of Louisiana affords to those who report fraud, abuse, or law-breaking within their own organizations. Louisiana's interest in defining the borders of this law is strong, and principles of comity thus weigh in favor of allowing a state forum to adjudicate this case.

---

[154]    28 U.S.C. § 1367(c).

[155]    *Smith v. Amedisys, Inc.*, 298 F.3d 434, 446 (5th Cir. 2002).

[156]    *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993).

[157]    *Amedisys*, 298 F.3d at 446-47.

Furthermore, because this litigation is still in its early stages, the goal of judicial economy will not be harmed by the dismissal of the state-law claim. The Court therefore finds that the rule counseling against the exercise of supplemental jurisdiction over state-law claims when no federal claims remain applies in this case, and it dismisses Kast's state-law claim without prejudice.


**IV.   CONCLUSION**

For the foregoing reasons, the Court GRANTS the motion to dismiss of defendants GNOEC, Lambert, and Levy.[158]


New Orleans, Louisiana, this 15th day of June, 2010.


_Sarah Vance_

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

---

[158]   (R. Doc. 41.)