UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL J. KAST                          CIVIL ACTION

VERSUS                                   NO: 09-4575

THE GREATER NEW ORLEANS EXPRESSWAY       SECTION: R(4)
COMMISSION, ROBERT J. LAMBERT AND
FRANK LEVY

## ORDER AND REASONS

This order amends the Court's order granting defendants'
motion to dismiss (R. Doc. 53), which omitted footnote 25 due to
clerical error. The Court's earlier order is not amended in any
substantive respect.

Before the Court is the motion to dismiss of defendants the
Greater New Orleans Expressway Commission ("GNOEC"), Robert
Lambert, and Frank Levy.[1] For the following reasons, the Court
GRANTS defendants' motion.


## I.    BACKGROUND

This action concerns the firing of Plaintiff Michael J. Kast
for his purported role in handling the high profile traffic stop
of Mandeville, Louisiana Mayor Eddie Price. At the time of the
incident, Kast was employed by GNOEC as a Lieutenant and

---

[1]    (R. Doc. 41.)

Operations Supervisor for the Causeway Police Department ("CPD"), the enforcement division of the GNOEC.[2]

## A. FACTUAL HISTORY

### 1. The Causeway Incident

On April 22, 2008, shortly before midnight, Price approached a tollbooth on the north shore side of the Lake Pontchartrain Causeway.[3] The tollbooth lane was closed. The gate was down. Flashing lights indicated the tollbooth's closure.[4] Price bumped the gate twice with his car, revved his engine, and barreled through the wooden arm of the tollbooth, damaging it in the process.[5] After breaking through the wooden tollbooth arm, Price stopped his car.[6] The tollbooth operator instructed Price to stay where he was because she had called the police.[7] Rather than remaining still, however, Price started his car and drove down the Causeway towards New Orleans with his lights off.[8] The

---

[2]  (R. Doc. 44, Ex. A, Kast Aff.)

[3]  (R. Doc. 41, Ex. B, Statement of Tollbooth Operator.)

[4]  *Id.*

[5]  *Id.*

[6]  *Id.*

[7]  *Id.*

[8]  *Id.;* (R. Doc. 31, ¶ 18.)

tollbooth operator took down Price's license plate number and called the CPD officers on duty.[9]

CPD officers Dupont and Dorsett responded to the tollbooth operator's call and pulled Price over shortly after midnight.[10] Dupont and Dorsett allegedly recognized Price, and Price admitted to the two officers that he had been drinking.[11] Nevertheless, Dupont and Dorsett did not administer a standard field sobriety test to determine Price's level of intoxication.[12] Instead, Dupont phoned Kast, his immediate supervisor, who was off-duty at the time.[13] Dupont informed Kast that he had made a traffic stop, the suspect was Mayor Price, and Price had been drinking, though he did not appear "impaired."[14] Dupont asked Kast what to do, and Kast responded that it was Dupont's decision because Dupont was the officer who had made the traffic stop and personally observed Price's mannerisms.[15] Kast also instructed Dupont to call Chief Lociano and inform him of the situation.[16]

---

[9] (R. Doc. 41, Ex. B, Statement of Tollbooth Operator.)

[10] (R. Doc. 31, ¶ 18-19)

[11] (R. Doc. 30.)

[12] *Id.*

[13] (R. Doc. 30.)

[14] *Id.*

[15] (R. Doc. 31, ¶ 21.)

[16] *Id.*

Dupont then called Chief Lociano.[17]  Chief Lociano gave Dupont

the same instructions given by Kast, *i.e.*, to determine for

himself what action to take with Price.[18]  Ultimately, Dupont and

Dorsett chose to let Price go without a citation or warning, and

without having administered a field sobriety test.[19]

## 2. CPD Internal Investigation

On May 5, 2008, Conrad H. Franz, a CPD officer, initiated an

internal investigation into the April 22 traffic stop of Mayor

Price.[20]  Franz's investigation involved the collection of

evidence and taking of witness statements.[21]  Pertinent here,

Franz took two separate statements from Kast.[22]  In the first

statement, Kast allegedly told Franz that he would follow the law

and not participate in any CPD "cover-up" of the Price traffic

stop.[23]  Kast does not allege, however, that Franz or any other

---

[17]  (R. Doc. 30.)

[18]  (R. Doc. 31, ¶ 22.)

[19]  Dorsett's police incident report indicates that Price
was in violation of La. R.S. 32:58, the criminal statute
prohibiting the careless operation of a motor vehicle.  (R. Doc.
21, Ex. A, GNOEC Report.)

[20]  (R. Doc. 41, Ex. A(1), Final Report of GNOEC
Investigation.)

[21]  (R. Doc. 31, ¶ 29.)

[22]  (R. Doc. 41, Ex. A(1), Final Report of GNOEC
Investigation.)

[23]  (R. Doc. 1, ¶ 17.)

CPD officer asked him to participate in a cover-up.[24]  In the

second statement, Kast clarified that Dupont had notified him of

the Price traffic stop, which was consistent with the

requirements of a standing order issued by Chief Lociano.[25]

According to Kast, the standing order required an officer who

arrested a politician or "otherwise connected" individual to

notify Kast and Chief Lociano of the incident because of the

potential publicity associated with the arrest.[26]

At the conclusion of the CPD internal investigation, Franz

prepared a 14-page report.[27]  The report concluded that Dupont

and Dorsett should have given Price a field sobriety test before

releasing him to determine if Price was driving while impaired.[28]

As a result of the report's recommendations, the CPD issued a

citation to Mayor Price on June 24, 2008 for careless operation

---

[24]    (R. Doc. 31.)  At oral argument the Court questioned
Kast's attorney as to why no allegation that Kast was asked to
take part in a coverup appeared in Kast's complaint.  Kast's
attorney first argued that it was implicit in Kast's complaint.
He then conceded that the complaint could have been stated more
clearly but believed that Kast could say that he had been asked
to participate in a cover up.

[25]    (R. Doc. 44, Ex. A, ¶ 18.)

[26]    (R. Doc. 1, ¶ 8.)

[27]    (R. Doc. 31, ¶ 29.)

[28]    (R. Doc. 31, ¶ 30.)

of a motor vehicle.[29]  The CPD also took disciplinary action

against both Dorsett and Dupont.[30]


### 3. GNOEC Investigation

Defendant GNOEC also conducted its own independent

investigation into the Mayor Price incident.[31]  The purpose of

this second investigation was both to determine whether Dupont

and Dorsett handled the situation appropriately and to respond to

"anonymous allegations of a police cover-up."[32]  The GNOEC

appointed a four member panel to perform the investigation.[33]

The panel consisted of two outside attorneys, a retired Drug

Enforcement Administration agent, and defendant Frank Levy, the

Vice Chairman of the GNOEC.[34]  During the course of its

investigation, the panel reviewed the CPD internal investigation

reports, interviewed GNOEC personnel, and reviewed state and

local law relevant to the Price traffic stop.[35] One panel member,

---

[29]    (R. Doc. 31, ¶ 29.)

[30]    (R. Doc. 41. Ex. A(1), Final Report of GNOEC
Investigation.)

[31]    *Id.*

[32]    *Id.*

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

William Reinhardt, contacted Kast and conducted a short telephone interview with him. During the interview, Kast "reiterated that he intended to follow Louisiana law and CPD policies and procedures, and would not participate in 'cover-ups' or granting certain citizens-including Mayor Price-preferential treatment based on who they were or who they knew."[36]

On July 1, 2008, the GNOEC independent panel issued a 28-page report detailing its findings of facts and conclusions.[37] The report found that Kast abdicated his responsibilities under CPD Regulation 17-3 by instructing Dupont to call Chief Lociano instead of either giving Dupont a direct order instructing him how to handle the situation or personally responding to the scene once Dupont called him.[38] The Report concluded that Kast should be terminated because his actions were "clearly contrary to departmental policy, rules and regulations."[39] On July 1, 2008, defendant Robert Lambert, the General Manager of the GNOEC, asked

---

[36]    (R. Doc. 31, ¶ 53.)

[37]    (R. Doc. 41. Ex. A(1), Final Report of GNOEC Investigation.)

[38]    *Id.*

[39]    *Id.*

Kast to resign from the CPD.[40]  After Kast refused, Lambert fired
him.[41]

**B.    PROCEDURAL HISTORY**

Kast sued defendants on July 2, 2009, alleging that
defendants retaliated against him in violation of his right to
free speech under the First Amendment and in violation of the
Louisiana Whistleblower statute.[42]  Specifically, Kast contends
that he was fired because he complained to Reinhardt about the
panel's interpretation of CPD Regulation 17-3 and what actions it
required Kast to take during Price's traffic stop.[43]  Defendants
removed the case to this Court under 28 U.S.C. § 1441 on the
basis of Kast's federal claims.[44]

On September 9, 2009, defendants filed a motion to dismiss
Kast's suit under Rule 12(b)(6), or alternatively a motion for
summary judgment under Rule 56.[45]  Instead of responding to the
defendants' motion, Kast asked the Court for leave to amend his

---

[40]    (R. Doc. 1, ¶¶ 32-33.)

[41]    (R. Doc. 1, ¶ 33-38.)  *See also* La. R.S. § 23:967
(Louisiana Whistleblower Statute).

[42]    (R. Doc. 1.)

[43]    *Id.*

[44]    (R. Doc. 1.)

[45]    (R. Doc. 9.)

complaint.[46]  The Court granted Kast's request on January 14, 2010.[47]  Kast's amended complaint adds factual allegations about the preferential treatment defendants gave to politically connected individuals during and after traffic stops and arrests.[48]  Kast's amended complaint also alleges that he was fired, in part, for continually voicing his opposition to Lambert's preferential treatment of politically connected individuals to Lociano, Lambert, and "others."[49]

## II.  LEGAL STANDARD

### A.  Determination

Defendants now re-urge their motion, with attached exhibits, styled "Motion to Dismiss Case for Failure to State a Claim upon which Relief Can Be Granted, and Rule 56 Motion for Summary Judgment."[50]  Defendants acknowledge that the Court may convert the Motion into a Rule 56 motion for summary judgment if it examines matters outside the pleadings.[51]  The Court must determine whether it will entertain the motion under the standard

---

[46]    (R. Doc. 19.)

[47]    (R. Doc. 30)

[48]    (R. Doc. 31, ¶¶ 14-15.)

[49]    (R. Doc. 30.)

[50]    (R. Doc. 41.)

[51]    *See* Fed. R. Civ. P. 12(d).

appropriate to motions to dismiss, or that appropriate to motions for summary judgment.

Defendants have attached exhibits to their motion, and Kast attached affidavits to his opposition.[52] Some of this material is duplicative of the pleadings that the Court may legitimately consider when adjudicating a motion to dismiss.[53] Other material, such as third-party affidavits and CPD regulations that were not attached to Kast's complaint or amended complaint, cannot be considered by the Court without transforming the motion into a motion for summary judgment. Federal Rule of Civil Procedure 12(d) indicates that "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion" before the Court may transform a motion to dismiss into a motion for summary judgment.[54] Although Kast

---

[52] Specifically, Kast attaches three affidavits: his own, that of his father-in-law, John Zifle, and that of his former co-worker, Albert Resendez. (R. Doc. 44.)

[53] *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006); *see also Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995). Kast's affidavit restates the allegations in his amended complaint. (R. Doc. 44, Kast Aff.)

[54] Fed. R. Civ. P. 12(d). *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d Ed. 2004) ("As the language of the rule suggests, federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.") An exception, inapplicable here, is when the material attached to the motion to dismiss is referred to in the plaintiff's complaint and is central to his claim. *See Causey v.*

recites the motion-to-dismiss standard in his opposition to

defendants' motion, he also recites the summary judgment standard

and presents material outside the pleadings.  Furthermore, Kast

has made no argument that the Court should decline to consider

materials outside the pleadings[55], or that it should not construe

the motion as one for summary judgment.

---

*Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir.
2004).

[55]   Kast objects to the consideration of defendants'
exhibits on the basis that the exhibits are not properly
authenticated.  Defendants attach to their motion CPD
Regulations, the GNOEC investigation report, the statement of
Marlene Williams taken during the CPD investigation, and the
Price traffic stop crash report.  In addition, defendants include
a certification by the GNOEC custodian of records that based on
her "knowledge" the exhibits are "true, and accurate" and "kept
in the ordinary course of business."  This is sufficient to
satisfy the requirements set forth in Federal Rule of Evidence
803(6), 104(a), and 902(11) with regard to the admissability and
certification of business records.  *See* Fed. R. Evid. 803(6);
*United States v. Bryant*, 04-CR-00047 2006 WL 1700107 (W.D.Va.
2006).  Even if insufficient, the Fifth Circuit has stated that
business records can be admitted "where circumstances indicate
that the records are trustworthy."  *See United States v.
Veytia-Bravo*, 603 F.2d 1187, 1191-92 (5th Cir. 1979)(records
prepared in ordinary course of business, and not for litigation,
trustworthy); *See also United States v. Flom*, 558 F.2d 1179,
1182-83 (5th Cir. 1979)(trustworthiness of business records
sufficient authentication).  Here, a custodian certified the
records and indicated that they were prepared in the ordinary
course of business.  Kast has provided no evidence that might
indicate that the records are not true and accurate, and in fact
he does not even suggest this.  Without reason to doubt the
trustworthiness of the records, the Court finds that defendants'
exhibits are properly authenticated.

Kast twice states that defendants seek to dismiss "before any discovery has been taken." (R. Doc. 44.) This argument implicates Rule 56(f), which states that if:

> a party opposing the motion shows by afficavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.[56]

Here, Kast responded to defendants' motion with his own summary judgment type evidence. He has not indicated what other "essential facts" he seeks to obtain through further discovery. Moreover, Kast does not argue that he could not, without discovery, "present by affidavit facts essential to justify the party's opposition." Nor does Kast suggest that he will be prejudiced in any manner by the Court's consideration of defendants' motion as one for summary judgment.[57] The Court will therefore treat the motion as one for summary judgment.

**B.    Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

[56]    Fed. R. Civ. P. 56(f).

[57]    *See, e.g., In re Repetitive Stress Injury Litigation*, 165 F.R.D. 367, 376 (E.D.N.Y. 1996);

12

that the movant is entitled to judgment as a matter of law."[58]
When assessing whether a dispute as to any material fact exists,
the Court considers "all of the evidence in the record but
refrains from making credibility determinations or weighing the
evidence."[59]  All reasonable inferences are drawn in favor of the
nonmoving party, but "unsupported allegations or affidavits
setting forth 'ultimate or conclusory facts and conclusions of
law' are insufficient to either support or defeat a motion for
summary judgment."[60]

     If the dispositive issue is one on which the moving party
will bear the burden of proof at trial, the moving party "must
come forward with evidence which would 'entitle it to a directed
verdict if the evidence went uncontroverted at trial.'"[61]  The
nonmoving party can then defeat the motion by either countering
with sufficient evidence of its own, or "showing that the moving
party's evidence is so sheer that it may not persuade the

---

     [58]   Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477
U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d
1069, 1075 (5th Cir. 1994).

     [59]   *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.
Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

     [60]   *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216
(5th Cir. 1985); *Little*, 37 F.3d at 1075.

     [61]   *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257,
1263-64 (5th Cir. 1991).

reasonable fact-finder to return a verdict in favor of the moving party."[62]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[63] The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.[64] The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.[65]

## III. DISCUSSION

Defendants argue that Kast's First Amendment claim must fail because Kast's speech is not protected by the First Amendment.[66] As to Kast's state law claim, defendants argue that Kast has not

---

[62] *Id.* at 1265.

[63] *Celotex*, 477 U.S. at 325.

[64] *Id.* at 324.

[65] *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

[66] (R. Doc. 41.); *See also Garcetti v. Ceballos*, 547 U.S. 410 (2006).

engaged in activity protected by the Louisiana Whistleblower Statute.[67]

## A. FIRST AMENDMENT RETALIATION CLAIM

To establish a First Amendment retaliatory discharge claim, Kast must prove that:

> (1) he suffered "an adverse employment action," (2) he spoke "as a citizen on a matter of public concern," (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the speech 'precipitated the adverse employment action."[68]

Here, Kast has failed to create a genuine issue of fact that he spoke as a citizen on a matter of public concern, and not as a public employee pursuant to his official duties. The Court therefore need not consider the other elements of Kast's First Amendment retaliation claim.[69]

### 1. *Garcetti* **and the Citizen/Employee Dichotomy**

In *Garcetti v. Ceballos*, the Supreme Court held that the First Amendment does not protect speech made pursuant to an employee's official duties.[70] Ceballos worked as a deputy district attorney in the Los Angeles County District Attorney's

---

[67]    (R. Doc. 41.)

[68]    *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007)(internal citations omitted).

[69]    *See Garcetti*, 547 U.S. at 421.

[70]    *Id.*

15

Office.[71]  When he discovered what he believed to be inaccuracies in an affidavit supporting a search warrant, he wrote a memo to his supervisor suggesting that the DA's office not prosecute the crime.[72]  The supervisor responded by transferring Ceballos and refusing to promote him.[73]  Ceballos sued, arguing that his memo was protected speech under the First Amendment.[74]  Reversing the Ninth Circuit[75] and ultimately rejecting Ceballos's claim, the Supreme Court stated that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[76]

Since *Garcetti*, the Fifth Circuit has further expounded upon when a public employee speaks pursuant to his "official duties."[77]  In *Williams v. Dallas Independent School District*, a

---

[71]   *Id.* at 413.

[72]   *Id.* at 414.

[73]   *Id.* at 415.

[74]   *Id.*

[75]   *Ceballos v. Garcetti*, 361 F.3d 1168, 1174-75 (9th Cir. 2004)(holding that the First Amendment applies to speech that is part of a worker's responsibilities).

[76]   *Garcetti*, 547 U.S. at 421.

[77]   *See e.g., Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 693-94 (5th Cir. 2007)(per curiam); *see also Nixon*, 511 F.3d at 497; *Charles v. Grief*, 522 F.3d 508, 513-14 (5th Cir.

high school principal fired Williams, then an athletic director and head football coach, for writing a memorandum concerning the alleged improper allocation of revenue from gate receipts generated by athletic events held on campus.[78]  Williams argued that he wrote the memorandum as a "taxpayer" and a "father," and the school district conceded that the memorandum was not required by Williams's job.[79]  The Fifth Circuit found, however, that Williams's job required him to consult with the principal about the athletic department budget, and Williams had "special knowledge" of the allocation of gate receipts as a result of his position as athletic director.[80]  The Court therefore held that Williams's speech was in the "course of performing his job" and not protected by the First Amendment.[81]

As an initial matter, Kast does not identify the precise content of his statements or instances of speech that allegedly led to his dismissal.[82]  Instead, he provides abstract descriptions of communications that he had with certain

---

2008); *Davis v. McKinney*, 518 F.3d 305, 311-314 (5th Cir. 2008).

[78]    *Williams,* 480 F.3d at 690-91.

[79]    *Id.* at 691-92.

[80]    *Id.* at 693-94.

[81]    *Id.*

[82]    (R. Doc. 31 and 44.)

individuals.[83]  He relies on three communications for his

retaliation claim, which the Court will examine below.

First, Kast argues that he refused to participate in a

cover-up of the Price traffic stop.[84]  Second, Kast contends that

he complained about the GNOEC panel's interpretation of CPD

Regulation 17-3.[85]  And lastly, Kast suggests that in the past,

he complained to Lambert and third-parties about GNOEC's

preferential treatment of well-connected individuals.[86]

### a.  Kast's Refusal to Participate in a Cover-Up

Kast contends that during the GNOEC investigation he told

Reinhardt that "he intended to follow Louisiana law and CPD

policies and procedures, and would not participate in 'cover-

ups.'"[87] Kast also asserts that he made the same statement to

Franz and Lociano during the CPD internal investigation.[88]  Kast

does not state, however, that any CPD officer or GNOEC employee

---

[83]    (R. Doc. 31, ¶ 87.)

[84]    (R. Doc. 31 and 44.)

[85]    *Id.*

[86]    *Id.*

[87]    (R. Doc. 31, ¶ 28.)

[88]    (R. Doc. 44, Ex. A, Kast Aff ¶ 51.)

asked him to participate in any cover-up, or that he reported to anyone that a cover-up existed.[89]

The Court finds that Kast's unsolicited statements during the GNOEC and CPD investigations were made in the course of his "official duties" as a police officer. Kast's statement to Reinhardt was made at work during "the [GNOEC] panel's only contact" with Kast.[90] Kast's statement also concerned the alleged cover-up of the Price traffic stop.[91] The CPD's response to the Price traffic stop, whether a cover-up or otherwise, was within Kast's work duties.

It is not dispositive, however, that Kast's statement during the GNOEC investigation was made within the workplace and concerned a matter related to his employment.[92] The *Garcetti* inquiry is a "practical one" designed to uncover "the duties an

---

[89] At oral argument, Kast's attorney stated that the request for Kast to participate in a cover-up was implicit in Kast's amended complaint. It was not. If such a request did in fact occur, Kast could have added the factual allegation to his complaint when he first moved to amend. *See Joseph v. Cannon*, 1996 WL 41849, at *1 (E.D.La. Feb. 1, 1996)(allowing amendment of complaint to add factual allegations)(citing *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1464 (5th Cir. 1995)).

[90] (R. Doc. 31, ¶ 53.)

[91] *Id.*

[92] *Garcetti*, 547 U.S. at 424-25; *see also Davis*, 518 F.3d at 313 n. 3 (citing *Williams*, 480 F.3d at 694 n. 1 (recognizing "that it is not dispositive that a public employee's statements are made internally.")).

employee actually is expected to perform."[93]  To this end, Kast admits that he was in charge of the day-to-day operations of the CPD.[94]  Moreover, Kast points out that a standing order existed requiring CPD officers patrolling the Causeway to notify Kast of any incident involving a high-profile individual so that he could "respond intelligently to any inquiries about the incident from the public, the press or the GNOEC."[95]  As instructed by the standing order, Dupont called Kast to inform Kast that he and Dorsett had pulled-over Price.[96]  The standing order contemplated that Kast would have to respond to an "inquiry" by the GNOEC.  It should have come as no surprise that the GNOEC later chose to investigate the Price incident and that Kast's response would be part of his work-related duties under the standing order.[97]  In addition, police officers have an obligation to participate in internal investigations as a matter of public policy.[98]

---

[93]    *Garcetti*, 547 U.S. at 424-25.

[94]    (R. Doc. 31, ¶ 11.)

[95]    (R. Doc. 31, ¶ 11.)

[96]    (R. Doc. 31, ¶ 20.)

[97]    (R. Doc. 31, ¶ 11.)

[98]    *See City of Baton Rough/Parish of East Baton Rough v. Capital City Press, L.L.C.*, 4 So.3d 807, 815 (La. Ct. App. 2009)(finding that police participation in internal investigations is critical, as a matter of public policy); *see also Bradley v. James*, 479 F.3d 536, 538 (8th Cir. 2007)(police have an official duty to cooperate in an internal investigation); *Toledo Police Patrolman's Ass'n v. City of Toledo*, 904 F.2d 36

Similarly, Kast's statement that he would not participate in a cover-up, made during the CPD internal investigation, was also part of his official duties. Unlike the GNOEC investigation, the CPD internal investigation was authorized and, in part, conducted by Kast's direct supervisor, Lociano.[99] Lociano, along with Franz, interviewed Kast because of Kast's involvement with the Price traffic stop, namely his phone conversation with Dupont.[100] Kast's statement was thus made at work, to his supervisor, and in the setting of an employer investigating the conduct of its employee.[101] "The case law is unanimous in holding that employee's communications that relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment Protection."[102]

### b. Kast's Statements Concerning CPD Regulation 17-3

Kast next argues that he was fired because he complained to Lambert and Reinhardt about the GNOEC's interpretation of CPD

---

(6th Cir. 1990)(unpublished)(relying, in part, on Toledo Municipal Code).

[99]    (R. Doc. 41, Ex. A(1), Final Report of GNOEC Investigation).

[100]    (R. Do. 31, ¶ 28.)

[101]    *Id.*

[102]    *Davis*, 518 F.3d at 313 n. 3 (citing *Williams*, 480 F.3d at 694 n. 1 (recognizing "that it is not dispositive that a public employee's statements are made internally.")).

Regulation 17-3.[103]  CPD Regulation 17-3 states that "a supervisor should respond to the scene of any incident or situation . . . where media attention is anticipated (*e.g.*, major incident, prolonged closure of roadways)."[104]  The GNOEC panel concluded that under CPD Regulation 17-3, Kast, as a supervisor, should have responded to the scene of the Price traffic stop because media attention was anticipated.[105]  Kast, on the other hand, contends that CPD Regulation 17-3 does not apply because the Price traffic stop did not involve contemporaneous media attention due to a "prolonged closure of roadways" or because of the presence of any of the other listed examples.[106]

Kast's grievance with the GNOEC panel is no different than Ceballos's memorandum in *Garcetti*.  It is speech made at work, up the chain of command, taking issue with the manner in which a particular policy is implemented.

Kast attempts to distinguish *Garcetti* by stating that the fact that he complained to a superior is not a bar to his claim.[107]  In support, Kast cites *Givhan v. Western Line*

_____

[103]  (R. Doc. 31, ¶ 87.)

[104]  (R. Doc. 41, Ex. A(2), CPD Regulation 17-3.)

[105]  (R. Doc. 41, Ex. A(1), Final Report of GNOEC Investigation.)

[106]  (R. Doc. 31, ¶ 55.)

[107]  (R. Doc. 44.)

22

*Consolidated School District[108],* a pre-*Garcetti* case in which the
Supreme Court stated that its precedent does not "support the
conclusion that a public employee forfeits his protection against
governmental abridgment of freedom of speech if he decides to
express his views privately rather than publicly."[109]  The speech
at issue in *Givhan*, however, did not relate to a personal
employment dispute.  Rather, Givhan arranged to meet with her
employer privately to discuss the discriminatory nature of the
employer's policies, which did not pose a direct threat to her
job.[110]

In contrast, Kast's complaints were made in the context of
an investigation of his conduct and concerned his personal
employment situation.  Because of this, Kast's speech is more
analogous to that in the Fifth Circuit pre-*Garcetti* case, *Teague
v. City of Flower Mound, Texas.[111]*  In *Teague*, the Fifth Circuit
held that police officers' statements concerning police
misconduct were made in the officers' capacity as employees
embroiled in an employment dispute, and therefore were not
entitled to First Amendment protection.[112]  As is the case here,

---

[108]    439 U.S. 410 (1979).

[109]    *Id.* at 414.

[110]    *Id.* at 412.

[111]    179 F.3d 377 (5th Cir. 1999).

[112]    *Id.* at 383.

the Fifth Circuit noted that the police officers' "focus (following their reprimands) was primarily on clearing their names-not on rooting out police corruption *per se*."[113]   Here, Kast complained only after the GNOEC panel concluded that he violated CPD Regulation 17-3 and recommended that he be terminated as a result.[114]   His speech is thus distinguishable from the protected speech in *Givhan* and more similar to the unprotected speech in *Garcetti* and *Teague*.

### c. Kast's Past Complaints About Preferential Treatment

Finally, Kast argues that he was fired for complaining about the preferential treatment Lambert provided well-connected individuals.[115]   In particular, Kast alleges that he objected to: (1) Lambert's allowing a politician to use a GNOEC generator to power his residence after Hurricane Katrina, (2) Lambert's forcing GNOEC employees to campaign for particular political candidates,(3) Lambert's forcing GNOEC employees to perform auto repairs for favored individuals, (4) Lambert's donating GNOEC money to the City of Mandeville, and (5) Lambert's using a CPD Sport Utility Vehicle to travel with other GNOEC personnel after Hurricane Katrina.[116]

---

[113]   *Id*.

[114]   (R. Doc. 44 and 31.)

[115]   (R. Doc. 44.)

[116]   (R. Doc. 31, ¶¶ 61-83.)

Kast contends that he complained about Lambert's conduct to Lociano, Lambert, and "members of the public, including friends and relatives."[117] In support, Kast attaches the affidavits of John Zifle, his father-in-law, and Albert Resendez, Kast's former co-worker.[118] Zifle's affidavit states that he and Kast discussed Lambert's activities at family social gatherings.[119] Resendez's affidavit states that Kast discussed with him Lambert's handling of the GNOEC generator incident.[120]

### i. Complaints to Lociano and Lambert

Kast's complaints to Lociano and Lambert were made pursuant to his official duties and are not protected by the First Amendment. First, Lociano and Lambert are Kast's superior officers.[121] Communications Kast made to each were therefore made internally, and up the chain of command. Second, reporting Lambert's alleged misconduct was part of Kast's official duties under the GNOEC employee handbook.[122] Specifically, CPD Regulation 3-1.1 requires a supervisor such as Kast to report to his superior matters concerning "gross misconduct by a [GNOEC]

---

[117]    (R. Doc. 31, ¶¶ 42, 72.)

[118]    (R. Doc. 44.)

[119]    (R. Doc. 44, Ex. B, Zifle Aff.)

[120]    (R. Doc. 44, Ex. C, Resendez Aff.)

[121]    (R. Doc. 31.)

[122]    (R. Doc. 41, Ex. A(8), CPD Regulation 3-1.1.)

member, suspected or confirmed corruption, [or] suspected or confirmed illegal activities by a [GNOEC] member."[123]  Kast acknowledged that he received a copy of the GNOEC handbook, and that it was his responsibility to read and comply with the policies contained in it.[124]  In sum, CPD policies required Kast to report Lambert's alleged misconduct and Kast did so to his superior officers.  Such speech is within the confines of Kast's official duties.

### ii. *Complaints to Zifle and Resendez*

When Kast complained to Zifle and Resendez his speech was that of a private citizen.  Zifle and Resendez were not Kast's superiors.[125]  Zifle was a member of Kast's family unaffiliated with the GNOEC, and Resendez was a shop employee at GNOEC.[126] When "a public employee takes his job concerns to persons outside the work-place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."[127] Defendants contend that Kast's complaints to Zifle and Resendez

---

[123]    *Id.*

[124]    (R. Doc. 41, Ex. A(9), Acknowledgment and Manual Receipts.)

[125]    (R. Doc. 44, Ex. B and C.)

[126]    *Id.*

[127]    *See Davis v.* McKinney, 518 F.3d 304, 313 (5th Cir. 2008)(citing *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006)).

would still fall under his duty to report under CPD Regulation 3-1.1.[128]  But on its face CPD Regulation 3-1.1 does not apply to Kast's discussions with non-superior officers or individuals unaffiliated with the GNOEC.[129]  The Court thus finds that Kast's complaints to Zifle and Resendez were not pursuant to his official duties.

Although Kast complained to Zifle and Resendez as a private citizen, he must still establish that his speech addressed a matter of public concern for it to garner First Amendment protection.[130]  To determine whether speech is on a matter of public concern, the Court examines the "content, form, and context of a given statement, as revealed by the whole record."[131]

It is true that the content of Kast's speech to Zifle and Resendez reveals instances of alleged police misconduct, and therefore implicates a matter of public concern.[132]  On the other

---

[128]    (R. Doc. 41.)

[129]    (R. Doc. 41, Ex. A(8), CPD Regulation 3-1.1.)

[130]    *See Davis v.* McKinney, 518 F.3d 304, 313 (5th Cir. 2008); Huth *v. Haslun*, 598 F.3d 70, 74 (2d. Cir. 2010); *Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010); *Desrochers v. City of San Bernardino*, 572 F.3d 703, 714 (9th Cir. 2009).

[131]    *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Jordan v. Ector County*, 516 F.3d 290, 295 (5th Cir. 2008).

[132]    *See Forsyth v. City of Dallas*, 91 F.3d 769, 773-74 (5th Cir. 1996)(concerning illegal wiretaps); Brawner v. City of Richardson, 855 F.2d 187, 192 (5th Cir. 1988)(allegations of police misconduct); *Branch v. City of Dallas*, 272 F.3d 730, 745 (5th Cir. 2001)("We have held that public employees' speech

hand, the form and context of Kast's speech weigh against such a conclusion and suggest private speech: Kast, simply did not make the public aware of his concerns.  A main purpose of First Amendment protection is to promote the "public's interest in receiving the well-informed views of government employees engaging in civic discussion."[133]  For example, the Fifth Circuit has held that speech made outside the work-setting to reporters or elected officials is of public concern.[134]  On the other hand, the Fifth Circuit has indicated that speech that is not disclosed to the public, such as that made in a personal notebook or to members of the same institution, is not.[135]  The Court finds that Kast's speech at private family gatherings and to his co-worker

---

reporting official misconduct, wrongdoing, or malfeasance on the part of public employees involves matters of public concern.").

[133]  *Garcetti*, 547 U.S. at 419.

[134]  *Markos v. City of Atlanta Tex,* 364 F.3d 567, 572-74 (5th Cir. 2004)(statements to newspaper); *Davis v. Ector County*, 40 F.3d 777, 786 (5th Cir. 1994)(letter to Commissioner's Court); *Modica v. Taylor*, 465 F.3d 174, 180-182 (5th Cir. 2006)(letter to state representative).

[135]  *See, e.g., Terrell v. University of Texas System Police*, 792 F.2d 1360, 1362-63 (5th Cir. 1986)(personal notebook); Markos, 364 F.3d at 572 (discussing *Bradshaw v. Pittsburg Independent School Dist.*, 207 F.3d 814 (5 Cir. 2000)(speech within institution)).  *See also Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985) (*Connick* "requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?").

are more analogous to the latter.  Kast did not attempt to bring

to light the alleged wrongdoing at the GNOEC by notifying a

reporter or public official.[136]  The Court therefore finds that

Kast's complaints to Zifle and Resendez do not qualify for First

Amendment protection.

---

[136]   *Markos,* 364 F.3d at 572-74 (statements to newspaper); *Davis*, 40 F.3d at 786 (letter to Commissioner's Court); *Modica*, 465 F.3d at 180-182 (letter to state representative).

**2.    Substantial or Motivating Factor Behind Defendants Action**

Even assuming, *arguendo*, that Kast's speech to Zifle and
Resendez is protected by the First Amendment, Kast has not shown
that his protected speech was a substantial or motivating factor
behind the GNOEC's decision to fire him.  Defendants provide
evidence that it was Kast's mishandling of the Price traffic
stop, violation of CPD Regulation 17-3, and the conclusions of
the GNOEC panel investigation that precipitated Kast's
termination.[137]  This is sufficient to carry defendants' initial
burden on summary judgment.[138]  The burden thus shifts to Kast,
who must, by submitting or referring to evidence, set out
specific facts showing that a genuine issue exists that a
substantial or motivating factor behind his termination was his
protected speech.[139]

Kast provides no argument and does not refer to particular
evidence in the record in support of his position.[140]  Instead,
Kast suggests that his affidavit and amended complaint are enough
on their own.[141]  Kast's affidavit restates the allegations and

---

[137]    (R. Doc. 41.)

[138]    *Celotex*, 477 U.S. at 325.

[139]    *Id.* at 324.

[140]    (R. Doc. 44.)

[141]    *Id.*

arguments in his amended complaint almost verbatim.[142]  Kast's
affidavit does not provide a sufficient evidentiary basis to
defeat summary judgment.[143]

Kast's best effort to defeat summary judgment would rely on
two facts: that Lambert fired Kast and that Lambert did so
because he was aware of Kast's complaints to Zifle and Resendez
and disagreed with Kast's stated positions therein.  Evidence of
Lambert's knowledge of Kast's communications to Zifle and
Resendez is noticeably absent from the record.  Kast's affidavit
makes no mention as to whether Lociano, Lambert, or any GNOEC
employee knew of Kast's communications.[144]  Nor do the affidavits
of Zifle and Resendez support this inference.[145]  When a plaintiff
brings a constitutional action against a public official, he
"must identify affirmative evidence from which a jury could find
that the plaintiff has carried his or her burden of proving the
pertinent motive."[146]  Without any evidence suggesting that

---

[142]    (R. Doc. 44, Ex. A, Kast Aff.)

[143]    *See, e.g., Celotex*, 477 U.S. at 325; *Little*, 37 F.3d at
1075; *Isquith for and on Behalf of Isquith v. Middle South
Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*,
488 U.S. 926 (1988).

[144]    (R. Doc. 41, Ex. A, Kast Aff.)

[145]    (R. Doc. 41, Ex. B and C.)

[146]    *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

Lambert knew of Kast's protected speech, Kast has failed to set forth any "affirmative evidence" of Lambert's wrongful motive.

Lastly, it is persuasive that the Fifth Circuit has found even more favorable facts insufficient to preclude summary judgment.[147]  In *Gerhart v. Hayes,* the only evidence of retaliation was the termination decision itself, and the fact that the employer was aware of and disagreed with the employee's stated position.[148]  The Fifth Circuit held that Gerhart did not put forward any evidence of Hayes's improper intent, and thus his claim could not survive summary judgment.[149]  Here, not only does Kast fail to put forward any evidence of Lambert's improper intent, but also Kast fails to put forward any evidence that Lambert knew of his protected speech and disagreed with it. Further, the statements to the shop employee were made almost five years ago, and although Zifle provides no date for Kast's communications with him, most of the content concerned events shortly after Hurricane Katrina, which was almost 5 years ago. The elapse of such a long period between speech and allegations

---

[147]  *See Gerhart v. Hayes*, 217 F.3d 320 (5th Cir. 2000).

[148]  *Id.*

[149]  *Id.*

of retaliation also undermine Kast's claim.[150]  Defendants' motion

for summary judgment is therefore GRANTED.

**B.    LOUISIANA WHISTLEBLOWER STATUTE**

Kast next alleges that he was terminated in violation of the

Louisiana Whistleblower Protection Act.[151]  The parties dispute

the requirements and application of the Act.[152]  The Court,

however, has disposed of the only claim arising under federal

law, and the Court does not have original jurisdiction over the

Louisiana Whistleblower Protection Act claim, which arises under

State law.  Accordingly, the Court must consider whether to

continue to exercise supplemental jurisdiction over Kast's

remaining claim.[153]  A district court may decline to exercise

supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or

---

[150]    *See Brady v. Houston Independent School Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997)(eighteen-month lapse); *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994)(ten-month lapse).

[151]    La. Rev. Stat. § 23:967.

[152]    (R. Doc. 44 and 41.)

[153]    See 28 U.S.C. § 1367.

> (4) in exceptional circumstances, there are other
> compelling reasons for declining jurisdiction.[154]

In addition to the statutory factors, the court must also balance the factors of judicial economy, convenience, fairness, and comity.[155] The Court has "wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed."[156] Still, the "general rule" is to decline to exercise jurisdiction over pendent state-law claims when all federal claims have been eliminated prior to trial.[157]

Here, the Court has dismissed the claims over which it had original jurisdiction. Only a state-law claim remains, and the Court has no independent basis for jurisdiction over it. The Court has not yet addressed the merits of this claim, and doing so will require it to delve into sophisticated issues of state law. The Louisiana Whistleblower Protection Act fundamentally implicates the level of protection that the State of Louisiana affords to those who report fraud, abuse, or law-breaking within their own organizations. Louisiana's interest in defining the borders of this law is strong, and principles of comity thus weigh in favor of allowing a state forum to adjudicate this case.

---

[154] 28 U.S.C. § 1367(c).

[155] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 446 (5th Cir. 2002).

[156] *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993).

[157] *Amedisys*, 298 F.3d at 446-47.

Furthermore, because this litigation is still in its early stages, the goal of judicial economy will not be harmed by the dismissal of the state-law claim.  The Court therefore finds that the rule counseling against the exercise of supplemental jurisdiction over state-law claims when no federal claims remain applies in this case, and it dismisses Kast's state-law claim without prejudice.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss of defendants GNOEC, Lambert, and Levy.[158]


New Orleans, Louisiana, this __13th__ day of September, 2010.


_Sarah Vance_

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

---

[158]  (R. Doc. 41.)